# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 20-0867V

| | |
|---|---|
| WILLIAM ASH,<br><br>     Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>     Respondent. | Chief Special Master Corcoran<br><br>Filed: May 8, 2024 |

*Bridget Candace McCullough, Muller Brazil, LLP, Dresher, PA, for Petitioner.*

*Camille Michelle Collett, U.S. Department of Justice, Washington, DC, for Respondent.*

### FINDINGS OF FACT AND RULING ON ENTITLEMENT[1]

On July 16, 2020, William Ash filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he suffered a right shoulder injury related to vaccine administration ("SIRVA") from an influenza ("flu") vaccine he received on November 5, 2018. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

For the reasons discussed below, I find that Petitioner more likely than not suffered the residual effects of his alleged vaccine-related injury for more than six months, and

---

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

that he has satisfied all of the requirements of a Table SIRVA claim. Therefore, Petitioner is entitled to compensation under the Vaccine Act.

## I. Relevant Procedural History

On October 29, 2021, about 16 months after the case was initiated, the parties began settlement discussions, but reached an impasse a year later. *See* ECF Nos. 23, 41. Respondent thus filed his Rule 4(c) Report on November 28, 2022, in which he argued that Petitioner could not satisfy severity or the Table elements of a SIRVA claim. Rule 4(c) Report at 8-11.

Petitioner filed a Motion for Ruling on the Record ("Mot.") on April 24, 2023. ECF No. 47. Respondent filed a response ("Resp.") on June 29, 2023. ECF No. 48. The matter is now ripe for adjudication.

## II. Relevant Facts

### a. *Medical Records*

Petitioner was a 47-year-old professional musician when he received the flu and pneumonia vaccines[3] on November 5, 2018, at Rite Aid Pharmacy in Brooklyn, NY. Ex. 1 at 1. Although the vaccination record states that the flu vaccine was administered into his "left upper arm," Petitioner alleges that the vaccine was actually administered into his right arm. *Id*.; Ex. 9 at ¶3. Petitioner contacted Rite Aid about the vaccine administration record and received a letter indicating that the record was created prior to administration and was not subsequently updated. Ex. 2 at 1.

On November 7, 2018 (two days after vaccination), Petitioner went to the emergency room with complaints of pain, swelling, and redness of his right upper arm/biceps. Ex. 5 at 9, 22. He had redness over his arm and normal range of motion. *Id*. at 10. He was diagnosed with cellulitis and prescribed a 10-day course of cephalexin. *Id*. at 10, 14.

Just over five months later, on April 18, 2019, Petitioner saw his primary care provider ("PCP") about his right arm pain. Ex. 3 at 18. He reported that he had "received influenza and pneumonia vaccines in right arm 11/2018 and then developed cellulitis," which was treated with antibiotics and resolved." *Id*. He reported persistent pain, which worsened with movement. *Id*. On exam, Petitioner's range of motion was decreased and his deltoid was tender to palpation. *Id*. at 19. X-rays revealed "narrowing subacromial

---

[3] The version of pneumonia vaccine Petitioner received is not a covered vaccine under the Vaccine Act.

space," indicating possible rotator cuff impingement, and narrowing of the AC joint. *Id*. at 63. Petitioner was referred to an orthopedist. *Id*.

On April 24, 2019, Petitioner saw orthopedist Dr. Vladimir Shur for his right shoulder pain. Ex. 4 at 1. He reported that he "had 2 vaccinations on November 5, 2018 which resulted in cellulitis" and continued to have pain and limited range of motion. *Id*. On exam, Petitioner had full strength, but limited range of motion. *Id*. Dr. Shur recommended NSAIDs, referred Petitioner to physical therapy, and ordered an MRI. *Id*. at 2.

Petitioner began physical therapy the same day. Ex. 8 at 5. He reported "that after having a flu shot at Rite Aid Pharmacy on November 5, 2018, he felt sudden onset of pain and stiffness on his right shoulder upon waking up the next morning." *Id*. On exam, Petitioner had decreased active range of motion, diminished strength, and positive impingement tests. *Id.* at 6. Petitioner completed 15 physical therapy treatments through July 12, 2019. *Id*. at 14-49.

On May 7, 2019, Petitioner returned to the emergency room with complaints of "persistent aching pain and tingling to the Rt arm/deltoid." Ex. 5 at 57. Petitioner reported that "his symptoms started after received an IM flu and pneumonia shots to the Rt deltoid/arm at Rite Aid on 11/5/18." *Id*. Petitioner noted that he was "treated for cellulitis of the arm in November and feels he still has "internal cellulitis" or myositis after speaking to a doctor on the phone. *Id*. at 57, 64. The physician's assistant who examined him "suspect[ed] underlying rotator cuff/referred pain," and believed that it was "unlikely" that his "symptoms relate to IM injections given 5 mo ago or cellulitis." *Id*. at 57. Petitioner was referred to an orthopedist. *Id*.

Petitioner returned to his PCP on May 13, 2019, for treatment for his right arm pain and for an ear problem. Ex. 3 at 10. Petitioner requested an MRI and a referral to a second orthopedist for a second opinion. *Id*.

On May 24, 2019, Petitioner saw an internist for "right shoulder pain since November when he got flu and pneumonia vaccine." Ex. 11 at 21. Petitioner reported having cellulitis "and then pain since November." *Id*. On exam, Petitioner displayed decreased active and passive range of motion. *Id*. He was diagnosed with impingement syndrome and referred to an orthopedist. *Id*. An MRI was also ordered. *Id*. Five days later, Petitioner returned for an annual physical during which he reported "right shoulder limited ROM due to pain since cellulitis 11/18 post vaccine administration." *Id*. at 16. He described dull, aching pain "radiating down his arm" that was worse with movement. *Id*. On exam, his range of motion was limited due to pain. *Id*. at 18. Petitioner was diagnosed with impingement syndrome, bursitis, and bicipital tendonitis. *Id*. An MRI was ordered, after which Petitioner would be referred to rheumatology or orthopedics, as appropriate. *Id*. at 19.

Petitioner's MRI (performed on June 10, 2019) revealed mild supraspinatus tendinosis, a superior labral tear, mild bursitis, a small glenohumeral joint effusion, and other findings consistent with adhesive capsulitis. Ex. 7 at 8-9.

Petitioner sought a second opinion from orthopedist, Dr. Yoav Rosenthal, on June 24, 2019. Ex. 6 at 6. Petitioner reported that he received a vaccine on November 5, 2018, developed cellulitis which was treated, and continued to have shoulder pain. *Id*. Petitioner stated that his pain "was acute in onset, located in the anterior part of his shoulder and arm and was significant" and also complained of limited range of motion. *Id*. On exam, Petitioner was tender to palpation and had reduced active and passive range of motion. *Id*. at 8-9. Dr. Rosenthal diagnosed adhesive capsulitis (frozen shoulder), tendonitis of the supraspinatus and long head of biceps, and subacromial bursitis. *Id*. at 9. He advised that adhesive capsulitis could take "up to 12-18 months" to resolve and occasionally requires surgery. *Id*. at 10. He prescribed over-the-counter anti-inflammatory drugs and physical therapy. *Id*.

Petitioner began a new course of physical therapy on July 25, 2019. Ex. 6 at 11. He reported "having flu vaccine on 11/5/18" and having an "immediate reaction to vaccine leading to cellulitis." *Id*. He stated that progressive worsening of the pain led him to see a doctor. *Id*. He reported his prior physical therapy treatment, "which [had] helped improve symptoms." *Id*. Petitioner had decreased range of motion and decreased strength. *Id*. at 13. Petitioner completed a total of six physical therapy sessions through October 7, 2019. *Id*. at 36.

Although Petitioner sought treatment for other medical issues in 2020, he did not return for further treatment for his shoulder pain until April 7, 2022, two and a half years after his physical therapy treatment ended. *See* Ex. 11 at 2-15; Ex. 23 at 5. He told his orthopedist that he had stopped his previous treatment "due to the pandemic and his wife had ACL surgery." Ex. 23 at 6. He reported continued pain with playing musical instruments and lifting heavy objects. *Id*. On exam, Petitioner's range of motion was reduced and impingement testing was positive. *Id*. at 8. Petitioner was referred to physical therapy. *Id*.

Petitioner returned to physical therapy on April 11, 2022. Ex. 24 at 32. He reported an "immediate reaction to vaccine leading to cellulitis, which resolved with medication, however pain and disability persisted." *Id*. at 33. Petitioner explained that he believed the vaccine had been injected into his bursa, leading to him having a recent Covid-19 vaccine administered in his leg. *Id*. He explained that he hadn't finished previous courses of physical therapy because "insurance kept running out before symptoms resolved." *Id*. On exam, Petitioner had reduced active and passive range of motion and diminished strength. *Id*. at 36. He completed a total of eleven physical therapy treatments through July 27, 2022. *Id*. at 40-51; Ex. 26 at 11-31.

4

Petitioner followed up with his orthopedist on May 2, 2022, and reported improvement. Ex. 23 at 24. He declined a cortisone injection. *Id*. at 25.

No further treatment records were filed.

   b. *Relevant Witness Testimony*

Petitioner filed an affidavit with his petition. Ex. 9. He recalled that once his cellulitis resolved, his shoulder pain "worsened and [he] began to lose [his] range of motion." *Id*. at ¶6.

Several of Petitioner's family members, friends, and work associates also submitted affidavits or letters in support of his claim. *See* ECF No. 22, 28, 30. As these state:

- Petitioner's brother-in-law recalled that Petitioner complained of right shoulder pain when they spent Thanksgiving together in 2018. Ex. 12 at ¶2-3.

- Petitioner's wife recalled that after his vaccination, he could no longer help "to carry things with his right arm," to open jars, or to clean the house. Ex. 20 at 1. She stated that she and Petitioner "expected . . . that his arm would heal naturally." *Id*.

- Petitioner's son recalled Petitioner complaining of right shoulder pain during a phone call on December 30, 2018 (the son's birthday). Ex. 21 at 1.

- Itai Kriss, a work associate, recalled playing a gig with Petitioner on December 31, 2018. Ex. 16 at 1. He observed Petitioner rubbing his right shoulder. *Id*. He remembered Petitioner "wanted to stop playing as soon as possible" and that Petitioner's playing quality was decreased. *Id*.

- Jose Rivera, a work associate, recalled playing a gig with Petitioner on February 14, 2019. Ex. 15 at 1. He noted that playing music was difficult for Petitioner and that he had to assist Petitioner with carrying equipment to his car "due to the weakness in his shoulder." *Id*.

- Jacob Plasse, a work associate, remembered playing music with Petitioner "every Sunday [at] a restaurant called Verlaine." Ex. 18 at 1. He observed that Petitioner "had to change his body position in relation to holding the bass, which negatively affected his playing ability." *Id.* He recalled having to hire help to set up the stage because Petitioner was unable to help. *Id*.

- Bernardo Pons, a work associate, recalled that Petitioner turned down musical performances scheduled in January, February, March, and April 2019 due to his shoulder pain. Ex. 13 at 1.

### III.  Applicable Legal Standards

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove by a preponderance of the evidence the matters required in the petition by Vaccine Act Section 11(c)(1). The Vaccine Act also requires that a petitioner demonstrate that "residual effects or complications" of a vaccine-related injury continued for more than six months. Vaccine Act §11(c)(1)(D)(i). A petitioner cannot establish the length or ongoing nature of an injury merely through self-assertion unsubstantiated by medical records or medical opinion. §13(a)(1)(A). "[T]he fact that a petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged injury." *Morine v. Sec'y of Health & Human Servs.*, No. 17-1013V, 2019 WL 978825, at *4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014).

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. In *Lowrie*, the special master wrote that "written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Lowrie*, at *19. And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

6

The United States Court of Federal Claims has recognized that "medical records may be incomplete or inaccurate." *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998). The Court later outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery*, 42 Fed. Cl. at 391 (citing *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

## IV. Findings of Fact

### A. *Site of Vaccination*

The entirety of the record preponderantly supports the conclusion that Petitioner more likely than not received the flu vaccine in his left arm.

Although the vaccine administration record is problematic (as it indicates that he received the vaccine in his "left upper arm), Petitioner approached Rite Aid about the record and received a letter in response which conceded both (1) that the record had been completed prior to administration to the vaccine and not updated after; and (2) that Petitioner had otherwise provided evidence of vaccination in the right arm. *See* Ex. 1 at 1; Ex. 2 at 1.

Further, Petitioner sought treatment for shoulder pain and redness at the injection site only two days after his vaccination. Ex. 5 at 8-11. He clearly attributed those symptoms to his vaccination two days prior, and the treating provider observed redness on Petitioner's right arm. *Id*. at 9-10. Petitioner continued to consistently report vaccination in the right shoulder when seeking treatment over the next almost three years, which is especially convincing evidence supporting his situs argument. *See, e.g.,* Ex. 3 at 18; Ex. 4 at 1; Ex. 8 at 5; Ex. 23 at 25.

The totality of Petitioner's medical records also clearly indicate that he suffered from right shoulder pain after vaccination, and that he attributed it to a flu shot administered into his right arm. He received treatment only to his right shoulder, including physical examinations, x-rays, an MRI, and three courses of physical therapy. There is no indication in the record of any other possible cause of Petitioner's right shoulder pain.

Overall, Petitioner's assertions are sufficiently corroborated by the medical records to accept his contention of vaccine situs. Accordingly, I find it more likely than not that the vaccine alleged as causal in this case was administered to Petitioner in the right shoulder/arm on November 5, 2018.

> B.   *Injury Localized to Vaccinated Arm*

Respondent further argues that "Petitioner's pain was not limited to his right shoulder." Resp. at 11. Respondent bases this argument on two records: (1) the May 7, 2019 emergency room record in which Petitioner described his pain as "tingling;" and (2) the May 24, 2019 record in which Petitioner described pain "radiating down his arm." *Id*.

Petitioner's medical records contain numerous references to his complaints about, and the treatment he received for, his right shoulder pain. Beyond the two notations cited by Respondent, there is no evidence in the record that Petitioner complained of, or received treatment for, pain or injury outside of his right shoulder. Petitioner received consistent treatment to his right shoulder, including examinations, x-rays, an MRI, and a total of 32 physical therapy sessions. Other than a lipoma on his right forearm, Petitioner was not diagnosed with any conditions outside of his shoulder, including to his neck, back, elbow, wrist, or hand. *See* Ex. 6 at 9.

While I acknowledge the references cited by Respondent, they are outweighed by the evidence in Petitioner's treatment records establishing that pain and decreased range of motion were limited to the right shoulder. Respondent's focus on these two records suggests that to satisfy the third QAI Table criterion, the relevant records must be devoid of all reference to pain or other symptoms outside the affected shoulder. However, a petitioner need only present preponderant, not certain, evidence to prevail. *See Moberly ex. rel. Moberly v. Sec'y of Health & Human Servs,* 592 F.3d 1315, 1322 (Fed. Cir. 2010)

(holding that the applicable level of proof is not certainty, but the traditional tort standard of "preponderant evidence").

Mr. Ash complained of and was treated for pain and limited range of motion to his right shoulder, even if pain in other locations was intermittently described. I therefore find there is preponderant evidence to support a finding that Petitioner has satisfied the third QAI Table requirement for a SIRVA injury.

### C. *Other Condition that Explains Petitioner's Symptoms*

Respondent argues that "Petitioner's medical records demonstrate that another condition or abnormality was present that explains Petitioner's symptoms proximate to vaccination." Resp. at 11. Specifically, Respondent argues that Petitioner was diagnosed with cellulitis, which explained all of his early reported symptoms, and then resolved with one course of antibiotics. *Id*. Respondent then argues that Petitioner's subsequent symptoms must have been a "separate and distinct shoulder injury." *Id*. at 12.

However, Respondent's argument assumes that Petitioner could not have had both cellulitis (which is a bacterial skin infection) and a SIRVA injury as a result of his vaccination. Respondent highlights that when Petitioner sought treatment two days after her vaccination, he "did not have any joint or muscle pain at that time, and he had full ROM on examination." Resp. at 11. However, the record of that visit clearly notes that Petitioner reported "aching" pain in his right upper arm. Ex. 5 at 9, 22. There was no extensive examination of Petitioner's shoulder muscles or joint after the obvious cellulitis diagnosis was made, which is common for emergency room treatment, and there was no further qualitative assessment of his pain.

Further, as noted by Petitioner, while the symptoms of cellulitis include redness, swelling, and pain, they do not include the other symptoms experienced by Petitioner, such as limited range of motion. *See* Mot. at 12-13. Cellulitis would also not explain the pathology seen on Petitioner MRI, including bursitis, tendinosis, or a labral tear.

Finally, while Respondent concedes that Petitioner's cellulitis resolved with antibiotic treatment, he seemingly ignores the remaining evidence in the record that Petitioner's shoulder pain persisted, and that his range of motion decreased over time (as is often seen in SIRVA cases). Resp. at 11. There is substantial evidence in the record that Petitioner experienced pain in his right shoulder and arm since his vaccination and that pain did not resolve with the antibiotics prescribed for his cellulitis. As such, I find that Petitioner's cellulitis diagnosis is not another condition that explains Petitioner's ongoing SIRVA symptoms and does not preclude a finding of a Table SIRVA injury.

### D. *Onset*

Respondent argues that Petitioner has not established Table onset because "the onset of Petitioner's shoulder pain and reduced range of motion was not present when Petitioner presented to the emergency department for treatment of his cellulitis two days after vaccination." Resp. at 12. But Respondent misstates the QAI requirement for onset, suggesting that it requires a claimant to demonstrate reduced range of motion *within* 48 hours after vaccination. In fact, to prove a Table SIRVA injury, a petitioner must only experience *pain* in that specified timeframe. *See* 42 C.F.R. § 100.3(c)(10)(ii)-(iii) (required onset for pain listed in the QAI; pain and reduced range of motion limited to the shoulder in which the intramuscular vaccine was administered). Although a Petitioner must experience *some* reduced range of motion as well, that symptom need not appear in the first 48 hours after vaccination - and in many SIRVA cases, it does not.

Further, Respondent discounts the record of the emergency room visit on November 7, 2018, which clearly indicates that Petitioner was suffering pain in his right upper arm. Ex. 5 at 9, 22. While the record states that Petitioner had "no joint pain, no myalgias," it is not clear that there was any investigation into the quality of Petitioner's pain. *Id*. at 9. Petitioner did, however, describe his pain as "aching," which may indicate a deeper pain was present at the time. *Id.* at 9. I further note that Petitioner described his pain as "aching" in subsequent records, including on May 7, 2019, when he returned to the emergency room and on May 29, 2019 during his annual physical. Ex. 5 at 57; Ex. 11 at 16.

Finally, Respondent fails to acknowledge the additional evidence that Petitioner's pain was ongoing. When Petitioner returned to treatment five months after his initial visit, he specifically stated that his "pain persisted" after his cellulitis infection had resolved. Ex. 3 at 18. Petitioner continued to assert that his shoulder pain began within 48 hours of his vaccination throughout the remainder of his treatment. *See e.g.* Ex. 6 at 6 (Petitioner reported that he received a vaccine on November 5, 2018, developed cellulitis which was treated, and continued to have shoulder pain that "was acute in onset, located in the anterior part of his shoulder and arm and was significant"); Ex. 6 at 11 (Petitioner reported "having flu vaccine on 11/5/18" and having an "immediate reaction to vaccine leading to cellulitis."); Ex. 8 at 5 ("after having a flu shot at Rite Aid Pharmacy on November 5, 2018, he felt sudden onset of pain and stiffness on his right shoulder upon waking up the next morning"); Ex. 11 at 21 ("right shoulder pain since November when he got flu and pneumonia vaccine").

Petitioner also provided numerous affidavits and other statements from witnesses that establish that his shoulder pain persisted from the time of his vaccination, even after his cellulitis resolved around November 17, 2018 (*See* Resp. at 11). Petitioner's brother-in-law recalled Petitioner's shoulder pain at Thanksgiving in late-November, 2018. Ex. 12

at ¶2-3. Petitioner's colleague recalled a musical performance on December 31, 2018 during which Petitioner rubbed his right shoulder and played worse than usual. Ex. 16 at 1. A work associate recalled playing a gig with Petitioner on February 14, 2019, after which he had to help Petitioner with carrying equipment to his car "due to the weakness in his shoulder." Ex. 15 at 1. Another work associate noted that Petitioner declined performances (for which he would have been paid) in each of January, February, March, and April 2019 due to his shoulder pain. Ex. 13 at 1. Such evidence, viewed as a whole, preponderates in favor of the determination that Petitioner's shoulder pain began within 48 hours after his vaccination but then worsened, including decreasing range of motion, over time. The gradual worsening of pain, along with the expectation that it would resolve naturally (Ex. 20 at 1), is a reasonable and credible explanation for Petitioner's delay in seeking further treatment.

Accordingly, I find there is preponderant evidence to establish the onset of Petitioner's pain occurred within 48 hours of vaccination.

E.   *Severity*

Respondent argues that Petitioner has not satisfied the statutory severity requirement because "Petitioner has not established by preponderant evidence that the initial cellulitis, which fully resolved by November 17, 2018, and subsequent shoulder pathology are one continuous injury." Resp. at 13. Again, Respondent's argument fails.

To satisfy the statutory severity requirement, Petitioner must demonstrate that his symptoms more likely than not continued until at least May 5, 2019. The record establishes that Petitioner sought treatment for right upper arm pain, swelling, and redness two days after his vaccination. Ex. 5 at 9. Then, there was a five-month gap in treatment until April 18, 2019. Ex. 3 at 18. Thereafter, Petitioner continuously treated his shoulder pain through October 7, 2019, well past the six-month deadline.

Therefore, the crucial question is whether Petitioner had ongoing symptoms between November 7, 2018 and April 18, 2019. The record supports the determination that he did. As stated above, there is ample evidence in the record that Petitioner's pain did not resolve with antibiotic treatment (even if the cellulitis did), but instead worsened. Petitioner in fact has stated that "once his cellulitis resolved, his shoulder pain "worsened and [he] began to lose [his] range of motion." Ex. 9 at ¶6. When seeking treatment, Petitioner consistently mentioned his cellulitis and his continuing pain despite treatment. *See e.g.*, Ex. 4 at 1 (he reported that he "had 2 vaccinations on November 5, 2018 which resulted in cellulitis" and continued to have pain and limited range of motion); Ex. 5 at 57, 64 (he reported that he was "treated for cellulitis of the arm in November and feels he still has "internal cellulitis" or myositis); Ex. 6 at 6 (he reported that he received a vaccine on

11

November 5, 2018, developed cellulitis which was treated, and continued to have shoulder pain); Ex. 24 at 32 (he reported an "immediate reaction to vaccine leading to cellulitis, which resolved with medication, however pain and disability persisted"). In additional to all of the medical record evidence, Petitioner provide several statements from his family and colleagues evidencing continued shoulder pain from November 2018 to April 2019, when he resumed treatment. Those statements, as discussed above, reveal Petitioner's continuing pain from at least Thanksgiving 2018 through April 5, 2019, only 13 days before Petitioner resumed treatment. Ex. 12 at ¶2-3; Ex. 13 at 1. In contrast, there is no evidence in the record suggesting that Petitioner's shoulder pain had resolved by November 17, 2018, as argued by Respondent.

Thus, after consideration of the entire record, I find that the evidence preponderates in Petitioner's favor on this issue. Of course, the gaps in treatment will likely affect the award of damages he may receive (and therefore Petitioner must be realistic about the fairest, and most likely, outcome for any damages award to be received in this matter).

## V. Ruling on Entitlement

### A. *Requirements for Table SIRVA*

I have found that Petitioner has preponderantly established that his pain began within 48 hours, that his pain and reduced range of motion were limited to the right shoulder, where he received the flu vaccination, and that Petitioner's cellulitis diagnosis does not preclude a finding of a Table SIRVA injury. 42 C.F.R. § 100.3(c)(10)(ii)-(iv). Respondent has not contested Petitioner's proof on the remaining element of a Table SIRVA. *See* 42 C.F.R. § 100.3(c)(10)(i). Accordingly, I find that Petitioner has provided preponderant evidence to establish that he suffered a Table SIRVA injury.

### B. *Additional Requirements for Entitlement*

Because Petitioner has satisfied the requirements of a Table SIRVA, he need not prove causation. Section 11(c)(1)(C). However, he must satisfy the other requirements of Section 11(c) regarding the vaccination received, the duration and severity of injury, and the lack of other award or settlement. Section 11(c)(A), (B), and (D).

The vaccine record shows that Petitioner received an influenza vaccination on November 5, 2018 in Brooklyn, NY. Ex. 1 at 1; Section 11(c)(1)(A) (requiring receipt of a covered vaccine); Section 11(c)(1)(B)(i) (requiring administration within the United States

or its territories). Additionally, Petitioner has stated that he has not filed any civil action or received any compensation for his vaccine-related injury, and there is no evidence to the contrary. Ex. 9 at ¶11; Section 11(c)(1)(E) (lack of prior civil award). And as noted above, I have found that severity has been established. *See* Section 11(c)(1)(D)(i) (statutory six-month requirement). Therefore, Petitioner has satisfied all requirements for entitlement under the Vaccine Act.

## Conclusion

**Based on the entire record in this case, I find that Petitioner has provided preponderant evidence satisfying all requirements for a Table SIRVA. Petitioner is entitled to compensation in this case. A separate damages order will be issued.**

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master